**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 23-cr-00026-4 |
| | : | |
| SHARIF JACKSON | : | |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                      **January 12, 2024**

Defendant was named, along with several co-defendants, in a Superseding Indictment charging them with conspiracy to commit drug trafficking and other drug and firearm offenses. Presently before the Court are several of Defendant's pretrial motions including discovery-related motions, a motion for a bill of particulars, motions *in limine* to bar evidence under Federal Rules of Evidence 404(b) and 403, a motion to sever his charges from those of his co-defendants, and a motion to suppress evidence seized from three cell phones pursuant to a search warrant. As explained in more detail below, these motions will be denied.

## I.    BACKGROUND

On January 24, 2023, the Grand Jury returned an Indictment charging Defendant Sharif Jackson ("Jackson") and eight co-defendants, most of whom were alleged members of the Gillard Street Gang, with conspiracy to distribute illegal narcotics as well as various other drug and firearm charges, all arising out of illegal activities occurring in Philadelphia, Pennsylvania from April 2021 through early January 2023. *See* ECF No. 1. Jackson was charged with (1) one count of conspiracy to distribute methamphetamine, phencyclidine, fentanyl, cocaine base, and heroin, in violation of

21 U.S.C. § 846;[1] (2) two counts of distributing, and aiding and abetting the distribution of, 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2;[2] and (3) two counts of distributing, and aiding and abetting the distribution of, 50 grams or more of methamphetamine within 1,000 feet of the property of a protected location, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), 21 U.S.C. § 860(a), and 18 U.S.C. § 2.[3] *See* Indictment at 1–12, 28–29, 50-51. On July 18, 2023, the Grand Jury returned a Superseding Indictment charging Jackson with the same offenses. *See* Superseding Indictment at 1–13, 29–30, 51–52.

After the filing of the Superseding Indictment, Jackson filed numerous pretrial motions over several months, including: (1) a Motion for Disclosure of Exculpatory Evidence, *see* ECF No. 130; (2) a Motion to Compel Discovery, *see* ECF No. 131; (3) a Motion for Government Agents to Retain Rough Notes, *see* ECF No. 132; (4) a Motion for Early Production of Jencks Material, *see* ECF No. 133; (5) a Motion to Join in Pretrial Motions Filed by Co-Defendants, *see* ECF No. 134; (6) a Motion for Bill of Particulars, *see* ECF No. 135; (7) a Motion *in Limine* to Bar Admission of all 404(b) Evidence, *see* ECF No. 159; (8) a Motion *in Limine* to Exclude Other Crimes Evidence Under Federal Rules of Evidence 403 and 404(b), *see* ECF No. 160; (9) a Motion for Severance, *see* ECF No. 161; (10) a Motion for a *Daubert* Hearing, *see* ECF No. 162; (11) a Motion to Identify Co-Conspirator's Statements, *see* ECF No. 170; (12) a Motion for Government's Expert Witnesses' Written Summaries, *see* ECF No. 171; (13) a Motion to Extend the Filing Deadline for Additional Motions, *see* ECF No. 180; and (14) a Motion to Suppress Evidence from the Search Warrant for Jackson's Cell Phones, *see* ECF No. 211.[4] The Government

---

[1] Count 1.
[2] Counts 17 and 39.
[3] Counts 18 and 40.
[4] Jackson sought and obtained permission to file this latter motion *nunc pro tunc*. *See* ECF Nos. 210, 212.

has filed responses in opposition to these motions except for Jackson's Motion to Join in Pretrial Motions Filed by Co-Defendants and Motion to Extend the Filing Deadline for Additional Motions. *See* ECF Nos. 186, 209, 213. An evidentiary hearing was held on Jackson's pretrial motions on December 12, 2023, at the conclusion of which Jackson withdrew several of his motions.[5] Jackson's remaining motions are ripe for disposition and will be addressed in turn.[6]

## II.   DISCUSSION

### A.      Motion for Government Agents to Retain Rough Notes (ECF No. 132)

Jackson moves for entry of an order "requiring all government law enforcement officers who investigated the charges in this and related cases to retain and preserve all rough notes taken as part of their investigation, notwithstanding whether the contents of the said notes were incorporated in the official records." Mot. for Gov't Agents to Retain Rough Notes and Incorporated Mem. of Law at ECF p. 2, ECF No. 132. Jackson contends that, even if the agents' rough, handwritten notes from interviewing witnesses are not discoverable under the Jencks Act, they are potentially discoverable material that the Government needs to preserve. *See id.* at ECF p. 3. Jackson also asserts that once he requests the Government to preserve the rough notes, any destruction of those notes could not be done in good faith. *See id.*

---

[5] As far as the Court can discern, Jackson withdrew (1) the Motion for Disclosure of Exculpatory Evidence, *see* ECF No. 130; (2) the Motion to Compel Discovery, *see* ECF No. 131; (3) the Motion for Early Production of Jencks Material, *see* ECF No. 133; (4) the Motion to Identify Co-Conspirator's Statements, *see* ECF No. 170; (5) the Motion for Government's Expert Witnesses' Written Summaries, ECF No. 171; and (6) the Motion for a *Daubert* hearing, ECF No. 162. Regarding this latter motion, Jackson's counsel and counsel for the Government discussed at the hearing Jackson having a potential issue with perhaps one of the Government's many experts. If Jackson seeks to challenge that expert's testimony, he shall promptly notify the Court so a hearing may be scheduled (if necessary) prior to that witness's testimony at trial.

[6] At the conclusion of the December 12, 2023 hearing, the parties were given the opportunity to supplement their submissions by no later than December 15, 2023. No such supplements were filed on Jackson's motions.

In response to this Motion, the Government argues that Jackson need not have even filed a motion seeking preservation of its agents' rough notes with prospective trial witnesses because the agents are already required to preserve the rough notes. *See* Gov't's Omnibus Resp. to Def.'s Pretrial Mots. ("Gov't's Omnibus Discovery Resp.") at 6, ECF No. 186 (citing *United States v. Vella*, 562 F.2d 275 (3d Cir. 1977)).[7] The Government also recognizes its obligation to request that its investigating law enforcement officers retain their rough notes relating to investigating and prosecuting the charged offenses. *See id.* Nevertheless, the Government points out that the agents' rough notes are only producible if the information in the notes falls under the Jencks Act or contains *Brady* material. *See id.* at 6–7 (citing *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994)), and it represents that it will continue to comply with its obligations by producing any Federal Rule of Criminal Procedure 16, Jencks Act, or *Brady* material contained in its agents' interview notes prior to trial. *See id.* at 7.

Here, Jackson has not claimed that the Government has failed to meet its discovery obligations thus far or failed to preserve its agents' rough notes from interviews with witnesses. Therefore, as the Government is apparently complying with its obligations, this Motion will be denied.

### B.   Motion to Join in Pre-Trial Motions Filed by Co-Defendants (ECF No. 134)

Jackson moves to join in pretrial motions filed by any co-defendants. *See* Mot. to Join in Pre-Trial Mots. Filed by Co-Defs. at ECF p. 2, ECF No. 134. More specifically, Jackson seeks leave to join in any other pretrial motions to the extent they are applicable to him. *See id.* At this point in time, the time for pretrial motions has long passed, *see* Am. Scheduling Order at ¶ 1, ECF

---

[7] In *Vella*, the Third Circuit Court of Appeals held that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the [defendant] under the rule of [*Brady*] or the Jencks Act." 562 F.2d at 276.

No. 152, and the Court cannot hypothesize which of his co-defendants' pending motions potentially applies to him as well. Therefore, this Motion will be denied as moot.

### C.      Motion for Bill of Particulars (ECF No. 135)

Jackson seeks the entry of an order directing the Government to file a Bill of Particulars containing the following requested information:

1. State the name of all co-conspirators known to the Grand Jury at the time of the Indictment and those to which the Grand Jury learned subsequent to the Indictment.

2. State the first event on which the Government intends to rely in its proof of the alleged conspiracy.

3. State the termination of the alleged conspiracy, and the last event on which the Government intends to rely in its proof of the alleged conspiracy.

4. State the inception of Sharif Jackson's participation in the alleged conspiracy as well as the time, date and place where Sharif Jackson became a member of the alleged conspiracy.

5. State the termination of Defendant's participation in the alleged conspiracy.

6. State any overt acts other than the acts encompassed in count one performed by the defendant, Sharif Jackson, in furtherance of the alleged conspiracy which the Government intends to offer proof of at trial.

7. State whether any defendant or any co-conspirator, named or unnamed in the Indictment was acting on behalf of the United States Government at the time of the alleged conspiracy and, if any, the identity of that person.

8. State the names of co-conspirators and others with whom defendant is alleged to have conversed with about illicit activities during the pendency of this conspiracy.

9. With respect to this conspiracy, state with specificity who are "the other coconspirators known to the grand jury" referred to in the manner and means of this conspiracy.

Mot. for Bill of Particulars at ECF pp. 2–3, ECF No. 135.

The Government opposes Jackson's request for a bill of particulars because it believes the Superseding Indictment provides "great detail" about the offenses charged against him. Gov't's Omnibus Discovery Resp. at 7; *see also id.* ("[T]he detail of the [Superseding Indictment] makes a bill of particulars unnecessary."). The Government asserts that the Superseding Indictment sufficiently describes Jackson and his co-defendants' roles in the conspiracy, the specific dates of the conspiracy, the manner and means of the conspiracy, and 70 overt acts committed in furtherance of the conspiracy. *See id.* It also explains that voluminous discovery has been provided to the defendants so far. *See id.* at 7–8. Overall, the Government contends that no bill of particulars is needed to apprise Jackson of the precise nature of the charges against him because the information in the Superseding Indictment and the discovery it has provided to the defense is "more than sufficient" to allow Jackson to prepare for trial. *See id.* at 8.

Jackson's request for a bill of particulars will be denied because he has not identified any basis to compel the Government to file such a bill. Of course, "[t]he court may direct the government to file a bill of particulars," Fed. R. Crim. P. 7(f), which is "a 'formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor.'" *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (quoting Black's Law Dictionary 177 (8th ed. 2004)). "The purpose of a bill of particulars is a 'to inform the defendant of the nature of the charges brought against [them], to adequately prepare [their] defense, to avoid surprise during the trial and to protect [them] against a second prosecution for an inadequately described offense.'" *Id.* (quoting *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir. 1971)).

"Whether to order the Government to produce a bill of particulars rests within the Court's discretion." *United States v. Islam*, Crim. A. No. 20-cr-00045, 2021 WL 312580, at *2 (E.D. Pa. Jan. 29, 2021) (citation omitted); *see Addonizio*, 451 F.2d at 64 ("[T]he granting of a bill of

particulars remains a discretionary matter with the trial court . . . ."). "A bill of particulars, however, is not a discovery tool and is not meant, 'to provide the defendant with the fruits of the government's case.'" *United States v. Smukler*, 330 F. Supp. 3d 1050, 1066 (E.D. Pa. 2018) (quoting *United States v. Knight*, Crim. A. No. 12-0367, 2013 WL 3367259, at *2–3 (E.D. Pa. July 3, 2013)); *see also Islam*, 2021 WL 312580, at *2 (explaining that while amendments to Federal Rule of Criminal Procedure 7 "were intended to 'encourage a more liberal attitude by the courts towards bills of particulars, . . . a bill of particulars is not a tool for broad factual discovery" (quoting Fed. R. Crim. P. 7, advisory committee's note to 1966 amendments) (citing *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985)). Instead, a bill of particulars is needed "if an indictment is so vague that it 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial.'" *United States v. Evans*, Crim. A. No. 12-616-9, 2015 WL 1072217, at *2 (E.D. Pa. Mar. 11, 2015) (quoting *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989)); *see also Smith*, 776 F.2d at 1111 (explaining that bill of particulars "is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation"); *cf. Hagner v. United States*, 285 U.S. 427, 431 (1932) ("The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what [they] must be prepared to meet, and, in case any other proceedings are taken against [them] for a similar offense, whether the record shows with accuracy to what extent [they] may plead a former acquittal or conviction.'" (quoting *Cochran v. United States*, 157 U.S. 286, 290 (1895) and *Rosen v. United States*, 161 U.S. 29, 34 (1896))).

Here, Jackson appears to be attempting to use a bill of particulars as a discovery tool insofar as he does not identify a single alleged deficiency with the information provided in the Superseding

Indictment. Instead, he only identifies the types of information he wants the Government to provide him, just as he would when requesting certain discovery. The Government asserts that it has provided voluminous information to Jackson and his co-defendants, and Jackson does not state anything to the contrary. Overall, without some indication about how the Superseding Indictment is deficient, a bill of particulars is not warranted, and Jackson's Motion will be denied.

      **D.**      **Defendant's Motion *in Limine* to Bar Admission of All Federal Rule of Evidence 404(b) Evidence (ECF No. 159)**

Jackson moves for an order barring the Government from introducing any evidence of character, other crimes, wrongs, or acts under Federal Rule of Evidence 404(b). *See* Def.'s Mot. in *Limine* to Bar Admission of All 404(b) Evidence at ECF p. 2, ECF No. 159. He points out that the Government is required to provide him with "reasonable notice" of any Rule 404(b) evidence it intends to offer at trial. *See id.* (quoting Fed. R. Evid. 404(b)). Because the Government has yet to provide him with notice of its intent to introduce such evidence, Jackson asserts that the Government should be barred from introducing any such evidence against him at trial. *See id.* at ECF p. 3.

In response to this Motion, the Government points out that Jackson fails to identify any acts or crimes that may be at issue. *See* Gov't's Omnibus Resp. to Def.'s Pretrial Mots. ("Gov't's Omnibus Pretrial Resp.") at 4, ECF No. 86. The Government also represents that it will comply with the requirements of Rule 404(b), and asserts that it does not intend to present "any character evidence in its case-in-chief occurring outside of the delineated timeframe of the conspiracy," i.e., April 2021 until approximately January 25, 2023. *Id.* If, however, Jackson would introduce "otherwise inadmissible character evidence that 'opens the door' to the admission of certain evidence," the Government states that it may proceed under the doctrine of curative admissibility

and introduce evidence to rebut or explain Jackson's evidence. *Id.* (citing *Gov't of V.I. v. Archibald*, 987 F.2d 180, 187 (3d Cir. 1993)).

Jackson's Motion *in Limine* will be denied. Rule 404(b) provides in pertinent part:

In a criminal case, the prosecutor must:

**(A)** provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;

**(B)** articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and

**(C)** do so in writing before trial--or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b)(3). As illustrated by the language used in Rule 404(b), all the Government has to do is provide Jackson with "reasonable notice" of any Rule 404(b) evidence it intends to introduce at trial. *See id.* 404(b)(3)(A). "What constitutes 'reasonable notice in advance of trial' is determined by the circumstances and complexity of the prosecution." *United States v. Johnson*, 218 F. Supp. 3d 454, 462 (W.D. Pa. 2016).

In this case, jury selection is scheduled for February 9, 2024, which is approximately one month away. *See* Am. Scheduling Order at ¶ 6. This gives the Government, should it seek to introduce Rule 404(b) evidence against Jackson despite its representation that it does not intend to do so in its case-in-chief, more than enough time to provide Jackson with "reasonable notice" of any Rule 404(b) evidence so that he "has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A); *see United States v. White*, 816 F.3d 976, 984 (8th Cir. 2016) (concluding notice one week prior to trial was sufficient); *Johnson*, 218 F. Supp. 3d at 462 (directing disclosure of Rule 404(b) evidence ten days before trial); *United States v. Tavarez*, 518 F. Supp. 2d 600, 604 (S.D.N.Y. 2007) (determining, in case where defendants were charged with conspiracy with intent to distribute a controlled substance, ten days' notice was reasonable); *United States v. Alex*, 791 F.

Supp. 723, 729 (N.D. Ill. 1992) (ordering government to disclose Rule 404(b) evidence seven days prior to trial). To bar the Government from introducing Rule 404(b) evidence now, when it has not yet failed to comply with the notice requirements of Rule 404(b), and apparently will not need to comply with those requirements due to its lack of intent to introduce Rule 404(b) evidence, is premature and unwarranted. Accordingly, Jackson's Motion in *Limine* will be denied.

**E.     Motion *in Limine* to Exclude Other Crimes Evidence Under Rule 403 and Rule 404(b) (ECF No. 160)**

Jackson moves for entry of an order precluding the Government from introducing evidence of other crimes under Federal Rules of Evidence 403 and 404(b). *See* Mot. *in Limine* to Exclude Other Crimes Evidence Under Rule 403 and Rule 404(b) at ECF p. 2, ECF No. 160. He claims that prior to the periods of the offenses identified in the Superseding Indictment—April 2021 to January 2023—he was convicted of unrelated crimes. *See id.* He points out that he was not on probation or parole for those convictions from April 2021 to January 2023. *See id.* Jackson argues that the Government should not be permitted to introduce any evidence of these prior offenses, his incarceration on the prior offenses, or any arrests for probation or parole violations pertaining to his prior offenses.[8] *See id.* He contends that such evidence would only show that he had the propensity to commit any of the charges contained in the Superseding Indictment, which is prohibited by Rule 404(b) and should be precluded under Federal Rule of Evidence 403 because its probative value is substantially outweighed by a danger of unfair prejudice. *See id.* at ECF pp. 2–3.

---

[8] Despite acknowledging his convictions for these allegedly unrelated offenses, Jackson refers to them as "uncharged crimes" twice in his Motion. *See id.* at ECF p. 3. If Jackson was convicted of a crime, it would not constitute an "uncharged crime" even if the crime was unrelated to the charges contained in the Superseding Indictment.

The Government has responded to this Motion as it had with the prior Motion. *See* Gov't's Omnibus Pretrial Resp. at 5. It represents that it does not intend to introduce Rule 404(b) evidence against Jackson in its case-in-chief outside the April 2021 to January 2023 timeframe. *See id.* It also indicates that if Jackson were to decide to testify in the case, it would seek to impeach him with a 2013 conviction for the same offense where he received a sentence of incarceration for a minimum of four years to a maximum of eight years. *See id.* at 6.[9] The Government asserts that it has provided Jackson's counsel with Jackson's prior criminal history during discovery and has filed a Motion *in Limine* for a determination of whether these prior convictions are admissible under Federal Rule of Evidence 609(a). *See id.* at 6; *see also* ECF No. 173.

Because Jackson's Motion is focused on Federal Rules of Evidence 404(b) and 403, and since he has responded to the Government's Motion *in limine* described above in a separate submission, *see* ECF No. 207, Jackson's Motion *in Limine* will be denied. Jackson does not describe the prior convictions and the evidence relating to those convictions that he seeks to have precluded at trial. This precludes analyses under either Rules 403 or 404(b) because such analyses cannot be performed in a vacuum. Moreover, the Government has represented that it does not seek to introduce evidence of Jackson's prior convictions in its case-in-chief, so there is no anticipated evidence to preclude at this time. Accordingly, Jackson's Motion *in Limine* will be denied.[10]

---

[9] In its response to the Motion, the Government expressed its desire to impeach Jackson with a 2009 conviction for possession with intent to deliver a controlled substance for which he received a sentence of incarceration for a minimum of three years to a maximum of eight years. *See* Gov't's Omnibus Pretrial Resp. at 5–6. During the evidentiary hearing, the Government stated that it no longer would seek to introduce evidence of the 2009 conviction. As such, the Court has not addressed that conviction here.

[10] The Government's Motion *in Limine* seeking a ruling under Rule 609(a) will be addressed in a separate opinion and order.

### F.      Motion for Severance (ECF No. 161)

Jackson seeks an order severing his charges in the Superseding Indictment from those of his other co-defendants. *See* Def.'s Mot. for Severance at ECF p. 4, ECF No. 161. Jackson points out that the Superseding Indictment includes 50 counts, covering an approximately two-year timeframe and involving several co-defendants, and six different kinds of controlled substances. *See id.* He notes that among those charges, he is charged in two alleged transactions and the overarching conspiracy. *See id.* In addition, he asserts that unlike three of his co-defendants, he was not charged with possessing a firearm. *See id.* He was also not charged with distributing any drug other than methamphetamine. *See id.* Based on these differences between his charges and those of his co-defendants, Jackson asserts that most of the evidence introduced at trial will not be related to him but will still prejudice him in the eyes of the jury. *See id.* He does not believe that the jury will be able to separate the evidence as to each defendant. *See id.* Thus, he contends that there is "a serious risk that the joint trial will compromise his trial rights and prevent the jury from making a reliable judgment about his guilt or innocence." *Id.*

Responding in opposition to the Motion, the Government generally argues that the defendants are properly joined, and Jackson has failed to demonstrate the unfair prejudice needed to justify severance of his charges. *See* Gov't's Omnibus Pretrial Resp. at 6. The Government asserts that Jackson's charges are properly joined with those of his co-defendants because he participated in either the same illegal act or transaction or series of illegal acts or transactions as the co-defendants insofar as he was a "key member in a large-scale [Drug Trafficking Organization]" with the co-defendants, and "they carried out a planned criminal act in concert with each other." *Id.* at 6, 7. It also contends that Jackson not being charged in every count of the

Superseding Indictment does not affect the propriety of the joinder because "[a]ll defendants need not be charged in each count." *Id.* at 7 (quoting Fed. R. Crim. P. 8(b)).

Although the Government claims that Jackson's charges are properly joined with those of his co-defendants, it recognizes that the Court retains discretion to sever counts for trial if it would prevent unfair prejudice to a defendant. *See id.* The Government explains that for Jackson to make such a showing (as it is his burden to do so), he has to "demonstrate 'clear and substantial prejudice' resulting in an unfair trial." *Id.* at 8 (quoting *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992)). The Government further explains that even were a defendant to show such prejudice, a district court need not exercise discretion to sever that defendant's charges because "other measures, such as limiting instructions at trial," could "sufficiently ameliorate the prejudice." *Id.* (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). It points out that the Third Circuit Court of Appeals' Model Criminal Jury Instructions includes jury instructions for cases involving multiple defendants charged with similar and different offenses. *See id.* (citing Third Circuit Model Crim. Jury Instr. Nos. 3.14, 3.15).

To the extent that Jackson raises a concern over prejudicial "spillover" evidence allegedly causing jurors to be confused and render them unable to separate the evidence admitted as to each defendant, the Government argues that this concern is meritless. *See id.* at 11. It claims that if the challenged evidence "would be admissible even in a separate trial, this militates strongly in favor of a joint trial, since 'a fair trial does not include the right to exclude relevant and competent evidence . . . .'" *Id.* (quoting *Zafiro*, 506 U.S. at 540). Moreover, it asserts there is "'no reason why relevant and competent testimony would be prejudicial merely because' the defendant is being tried with a codefendant." *Id.* (quoting *Zafiro*, 506 U.S. at 540).

Given these considerations, the Government explains why severance of Jackson's charges is unwarranted in this case:

> The very nature of a conspiracy involves more than one defendant engaged in overt acts to further the conspiracy. It would be rare to find a case where each defendant committed precisely the same overt acts to accomplish the criminal activity. An effective criminal organization involves specialized and varied conduct on behalf of the individuals contributing to the benefit of the organization as a whole. Indeed, if the Court granted a motion for severance, it would force the government to present virtually the exact evidence through the same witnesses separate times before multiple juries.

*Id.* at 11–12.

After considering the parties' arguments, Jackson's Motion for Severance will be denied. Regarding joint trials generally, "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."[11] Fed. R. Crim. P. 8(b). Also,

> it is not enough that defendants are involved in offenses of the same or similar character; there must exist a transactional nexus in that the defendants must have participated in "the same act or transaction, or in the same series of acts or transactions," before joinder of defendants in a multiple-defendant trial is proper.

*United States v. Walker*, 657 F.3d 160, 169 (3d Cir. 2011) (quoting *United States v. Jimenez*, 513 F.3d 62, 82–83 (3d Cir. 2008)). When considering whether joinder is proper, district courts may look beyond the face of the indictments to other pretrial documents that "clarify factual connections between the counts." *United States v. McGill*, 964 F.2d 222, 242 (3d Cir. 1992).

Additionally, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro,* 506 U.S. at 537–38. These joint trials "promote economy of judicial

---

[11] A district court may also "order separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information." Fed. R. Crim. P. 13.

and prosecutorial resources." *United States v. Gorecki*, 813 F.2d 40, 42 (3d Cir. 1987) (citing *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980)).

Despite this preference for joint trials, a district court may "separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). A district court has "sound discretion" to sever charges in a criminal case. *See Zafiro*, 506 U.S. at 538–39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."); *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981) ("Motions for severance rest in the sound discretion of the trial judge, whose determination should not be disturbed in the absence of an abuse of discretion." (citation omitted)).

> If the government has properly joined defendants under Rule 8,
>
> a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.

*Zafiro*, 506 U.S. at 539 (citation omitted).

In this case, Jackson has failed to show that his charges are improperly joined with his co-defendants or that he will suffer any prejudice from a joint trial. Concerning the propriety of joinder, the Superseding Indictment contains sufficient allegations showing that Jackson and his co-defendants were participating in the same series of acts and transactions. In this regard, the Superseding Indictment describes in detail how the defendants' drug trafficking organization

distributed several types of illegal drugs, with Jackson participating in the organization's distribution of methamphetamines. Accordingly, the joinder of the defendants' cases is proper.

Although joinder may be permitted, it is not mandatory, and the Court still has discretion over whether to consolidate or sever the cases. *See United States v. Weber*, 437 F.2d 327, 331 (3d Cir. 1970) (explaining that trial courts have "wide discretion to consolidate indictments" and defendant attempting to show trial court erred in failing to sever charges "must make an affirmative showing that the [trial court] abused its discretion"). Here, there are no grounds warranting severance because Jackson has failed to make any showing of possible prejudice. *See* Fed. R. Crim. P. 14(a) (allowing severance if consolidation appears to prejudice defendant). At best, Jackson's claims of prejudice are conclusory and speculative, and he has not demonstrated that "there is a serious risk that a joint trial would compromise a specific trial right of [his], or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

To the extent that Jackson's claim of prejudice is based on a risk of prejudice from "spillover" evidence presented against his co-defendants, he has still failed to show prejudice. An inquiry into prejudice from "spillover" evidence "hinges upon 'whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility.'" *Walker*, 657 F.3d at 170 (quoting *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005)). Contrary to Jackson's contentions, there is little concern that the jury will be unable to compartmentalize the evidence as it relates to the defendants. Even if this case is complex, as this Court previously designated, *see* ECF No. 61, the charges are "relatively straightforward and discrete." *Id.* (quoting *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005)). Jackson's alleged role in the overarching conspiracy is specified in the Superseding Indictment, and the facts relating

to the charges against each defendant are readily distinguishable. Accordingly, the risk of prejudice is minimal at best.

Furthermore, to the extent that there was any possible prejudice to Jackson, the Court can mitigate any such prejudice through jury instructions giving separate consideration to each charge against each of the defendants. There is no indication at this time that the jury will be unable to compartmentalize the evidence against each of the defendants. *See United States v. Savage*, Crim. A. Nos. 07-00550-03, 07-00550-04, 07-00550-05, 07-00550-06, 2012 WL 6609425, at *7 (E.D. Pa. Dec. 19, 2012) ("This is not a case in which the jury will be unable to compartmentalize the evidence against each Defendant. While the Indictment describes 140 overt acts, the allegations in the Indictment with respect to each Defendant are clear."), *aff'd*, 85 F.4th 102 (3d Cir. 2023); *see also United States v. Urso,* 369 F. Supp. 2d 254, 269–70 (E.D.N.Y. 2005) (concluding that while joint trial involving six defendants, four murder allegations, and numerous racketeering offenses, could be "quite lengthy," "a joint trial of these defendants is more consistent with the fair administration of justice than would be a division of these defendants"); *United States v. Edelin,* 118 F. Supp. 2d 36, 44 (D.D.C. 2000) (finding that even though the case involved capital and non-capital defendants, it was "not so complex that a jury could not compartmentalize the evidence presented to it"). Instead, this Court "presume[s] that the jury follows such [cautionary] instructions, and regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant." *Urban*, 404 F.3d at 776 (internal citation omitted).

In conclusion, the Court finds that public interest in the judicial economy of a joint trial outweighs any potential for prejudice to Jackson being associated with the charges and evidence against his co-defendants. A joint trial "generally serve[s] the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages

17

which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh,* 481 U.S. 200, 210 (1987); *see also United States v. Hart,* 273 F.3d 363, 370 (3d Cir. 2001) (rejecting appellant's argument that joint trial prejudiced him since "much, if not all, of this [conspiracy] evidence could have been presented against [defendant] had the trials been severed," and because district court instructed jury to "give separate individual consideration to each charge against each defendant"). Furthermore, the jury will be capable of following a limiting instruction and compartmentalizing the evidence when it comes to Jackson and his co-defendants. Accordingly, Jackson's Motion for Severance will be denied.

### G.    Motion to Extend the Filing Deadline for Additional Motions (ECF No. 180)

Jackson seeks entry of an order extending the filing deadline for him to file additional pretrial motions in the nature of motions to suppress the fruits of searches of (1) two houses the Government allegedly associated with him, pursuant to search warrants, (2) his car, and (3) phones he owned or used. *See* Def.'s Mot. to Extend the Filing Deadline for Add'l Mots. at ECF pp. 2–3, ECF No. 180. Jackson seeks this additional time because his counsel, at the time of the filing of the Motion, could not access the search warrant files provided by the Government. *See id.*

This Motion will be denied because Jackson has not pursued his purported desires to seek suppression of evidence from searches of the two houses and his car. Instead, on December 7, 2023, he filed a motion for permission to file a suppression motion relating to only the search of his cell phones *nunc pro tunc*, which was later granted. *See* ECF Nos. 210, 212. Because Jackson has not sought to file motions to suppress the evidence seized from searches of the houses or cars or reasserted his counsel's continued inability to access the search warrant files disclosed by the Government, his Motion for Additional Time to File Additional Pretrial Motions will be denied.

**H.    Motion to Suppress Evidence from the Search Warrant for Jackson's Cell Phones (ECF No. 211)**

**1.    The Parties' Arguments**

Jackson moves for entry of an order suppressing any evidence obtained via a search warrant issued to search three cell phones because the warrant allegedly violated the Fourth Amendment in at least four ways.[12] *See* Def.'s Mot. to Suppress Evidence from the Search Warrant from Def.'s Cell Phones ("Suppression Mot.") at 6–9, ECF No. 211. First, Jackson asserts that the search warrant was not supported by probable cause. *See id.* at 6. Second, Jackson contends that the search warrant was overly broad insofar as it did not particularly describe the place within the phones to be searched and the things to be seized, and the affiant did not "list any parameters on the search by date[,] . . . mean[ing] that the government could search activity dating back years when there was no evidence to support the search." *Id.* at 6–7. Third, Jackson maintains that the affidavit of probable cause contained false information and included statements he made to law enforcement after being read his rights and electing not to speak with law enforcement without an attorney present, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), the Fifth Amendment, and the Sixth Amendment. *See id.* at 7–8, 9. Fourth, and finally, Jackson contends that part of the basis for probable cause in the warrant was based on an illegal traffic stop. *See id.* at 8–9.

The Government opposes Jackson's Motion, arguing that it should be denied because the search warrant did not violate the Fourth Amendment and Jackson did not carry his burden to show any basis for his Motion. *See* Gov't's Resp. to Defs.' Pretrial Mot. to Suppress Evidence from the Search Warrant for Def.'s Cell Phones ("Gov't's Mot. Suppress Resp.") at 4–5, ECF No. 213. The

---

[12] Jackson appears to believe he challenges the search warrant in only three ways. *See generally* ECF No. 211. Nevertheless, the Court has interpreted the Motion to include at least four challenges to the warrant.

Government rejects Jackson's claim that the search warrant and affidavit of probable cause had any deficiencies, and it identifies several portions of the affidavit which it believes supports a finding of probable cause.[13] *See id.* at 7–9. The Government contends that Jackson simply ignores all paragraphs of the affidavit of probable cause that does not fit with the argument he is trying to assert, such as ignoring the affiant's training, experience, and knowledge. *See id.* at 9.

In addition, the Government disputes that any evidence referenced in the affidavit of probable cause was obtained unlawfully, believing Jackson has confused what occurred immediately after his arrest and what occurred at an interview later that same day. *See id.* at 10. As for the statements Jackson made during his interview, the Government argues that those statements were not obtained in violation of *Miranda* because they were made in response to "routine booking" questions or law enforcement administration unrelated to gathering evidence in support of the offense for which he was arrested. *See id.* at 11–12. Moreover, even if there was some issue with the search warrant, such as lacking probable cause or otherwise containing a defect, the Government insists that suppression is unwarranted because law enforcement "reasonably relied upon the judicially approved warrant." *Id.* at 12–13.

---

[13] While it appears to the Court that Jackson is challenging the search warrant for each cell phone in all respects, the Government characterizes his Fourth Amendment challenges as follows:

> The defendant does not contest that probable cause existed to search TARGET TELEPHONE 1 for phone logs, location data, and Facetime information in connection with the July 7, 2022, controlled buy of narcotics from Jackson as described in the indictment and the search warrant.2 He limits his argument to that of an overbreadth of time included in the warrant and a lack of probable cause for items searched outside of the July 7, 2022, controlled purchase. In addition, he claims there was no probable cause to search TARGET PHONE 2 and TARGET PHONE 3.

*Id.* at 7.

The Government last addresses Jackson's overbreadth argument, by arguing that his argument is inconsistent with the applicable law pertaining to searches of electronic devices. *See id.* at 13–14. It asserts that the cell phone search had to be broad "due to the mechanisms by which a cell phone can store information, and the ease that it can be manipulated." *Id.* Further, despite the need for a broad search, the Government points out that the search was limited to the criminal activity identified in the warrant, i.e., narcotics trafficking, conspiracy to distribute narcotics, and the use of communication facilities to facilitate narcotics trafficking. *See id.* at 14. Therefore, law enforcement never conducted a "wholesale search" of the cell phones as Jackson contends. *See id.*

### 2.    Findings of Fact[14]

Based on the evidence presented during the evidentiary hearing on December 12, 2023, and the exhibits submitted by the parties during and after the hearing, the Court makes the following findings of fact:

### The Controlled Purchase on October 12, 2023

1.    In the late afternoon on October 12, 2023, law enforcement conducted surveillance of the 2900 block of Tulip Street in Philadelphia for purposes of conducting a controlled purchase of illegal narcotics.

2.    The surveillance included visual/physical surveillance by law enforcement officers on the ground, video surveillance from two pole cameras installed in the area, and aerial surveillance through the Federal Bureau of Investigation ("FBI")'s plane, which was able to capture video from the area.

---

[14] "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d).

3.      Among the individual law enforcement members conducting visual or video surveillance were Special Agents William Becker ("SA Becker"), Benjamin Hallowell ("SA Hallowell"), and Marcus Heyer of the FBI.

4.      For the controlled purchase, a confidential human source ("CHS") ordered a certain amount of illegal narcotics from Defendant Diane Gillard.

5.      At approximately 4:51 p.m., the CHS drove their vehicle to the 2900 block of Tulip Street where they encountered Ms. Gillard, who was standing on a street corner and not wearing any kind of bag.

6.      Approximately one hour later, Ms. Gillard made some sort of gesture toward the CHS and then walked towards a black Jeep Cherokee bearing the license plate LYE1251.

7.      When Ms. Gillard reached the Jeep, she reached into the front passenger seat and put a dark bag over her shoulder. She then walked towards the CHS's vehicle. At the same time, a black male wearing a fluorescent green t-shirt and black baseball cap exited the Jeep's rear passenger side seat and stood by the Jeep. This male was later identified as Jackson.

8.      Jackson was the only individual in the Jeep prior to Ms. Gillard entering it.

9.      The Jeep was registered to Jackson.

10.      This was not the first occasion where law enforcement noticed the Jeep as part of their investigation; instead, methamphetamine purchased at a prior controlled purchase was supplied from that Jeep.

11.      Ms. Gillard entered the CHS's vehicle and conducted a drug transaction with the CHS. The CHS purchased approximately two pounds of methamphetamine from Ms. Gillard.[15]

---

[15] Law enforcement did not test the purchased drugs until after the operation concluded. The test showed that the purchased drugs were pure methamphetamine.

12.     Ms. Gillard then left the CHS's vehicle with a red bag containing the purchase money given to the CHS by law enforcement.

13.     Ms. Gillard returned to the Jeep, where she entered the front passenger side seat. A short time later, she exited the Jeep and walked away.

14.     Jackson was observed exiting the rear passenger side seat of the Jeep, entering the driver's seat, and then driving away.

15.     Law enforcement, through physical and aerial surveillance, followed Jackson and the Jeep for approximately 30 minutes after it drove away. At the conclusion of the approximately 30 minutes, Jackson parked the Jeep and entered a residence.

16.     Approximately an hour later, the lights on the Jeep activated and it began traveling.

17.     At SA Becker's direction, City of Philadelphia Police Department Sergeant Timothy Linahan conducted a traffic stop of the Jeep, which was approximately 90 minutes after the controlled purchase.

18.     SA Becker believed that there was probable cause to stop the Jeep because law enforcement had just witnessed Jackson use the Jeep to participate in a controlled purchase of methamphetamine.

19.     SA Becker asked Sergeant Linahan to stop the Jeep to get the identification of the driver of the vehicle.

20.     Sergeant Linehan's stop of Jackson was captured on video.[16]

21.     Jackson was the operator of the Jeep and, at Sergeant Linahan's request, provided him with his driver's license.[17]

---

[16] *See* Gov't's Ex. 25.

[17] Sergeant Linahan requested that Jackson provide him with his identification under the false premise that he may have matched the description of someone involved in activity in another area.

22.     The video of Sergeant Linahan's interaction with Jackson shows Jackson wearing a fluorescent green shirt and a black hat while seated in the driver's seat of the Jeep.

23.     Sergeant Linahan appears to run a check on Jackson's license while in his police vehicle, and he later returns Jackson's license to him, apologizes, and lets Jackson resume traveling in the Jeep.

24.     Sergeant Linahan's stop of Jackson's Jeep lasted approximately two minutes.

25.     Law enforcement did not arrest Jackson at that time, even though he was observed supplying and selling methamphetamine, because they did not want to "blow their cover."

**Jackson's Arrest on January 25, 2023**

26.     On January 25, 2023, Jackson was arrested on the charges included in the original Indictment in this case.

27.     SA Hallowell was present during Jackson's arrest on the morning of January 25, 2023.

28.     While attempting to arrest Jackson, SA Hallowell and other law enforcement members traveled to an address that they believed was Jackson's address, only to discover that he no longer lived there. They received information about another possible address for Jackson, so they traveled there and located Jackson's black Jeep.

29.     SA Hallowell and other members of law enforcement waited and observed Jackson's Jeep until approximately 10:00 a.m., when they saw Jackson come around a corner of a building and walk towards the Jeep.

30.     SA Hallowell and other members of law enforcement intercepted Jackson as he approached his Jeep, identified themselves as law enforcement, and informed Jackson that he was under arrest. Jackson was cooperative when placed under arrest.

31.     There were approximately six to twelve agents and task force members at the scene at the time of Jackson's arrest.

32.     Incident to Jackson's arrest, law enforcement members conducted a protective search of Jackson's clothing, during which they located and seized three cell phones.

33.     SA Hallowell saw, on what he believed was a cell phone subsequently identified as "TARGET TELEPHONE 3," a text message stating something to the effect of "bro call me…..I'm cooked."

34.     SA Hallowell was unable to capture a photograph of the text message before the cell phone auto-locked and the message disappeared from the screen.

35.     In SA Hallowell's training and experience, the text message he observed was significant and likely from a co-conspirator that was concerned with being arrested since law enforcement was in the process of arresting multiple defendants named in the operative indictment in this case on January 25, 2023.

36.     SA Hallowell did not read Jackson his *Miranda* warnings at the time of his arrest and did not believe any other member of law enforcement did at the scene of Jackson's arrest.

37.     SA Hallowell did not read Jackson his *Miranda* warnings at the time of his arrest because he was not planning on asking Jackson questions about the criminal activities leading to his arrest.

38.     Jackson asked why he was under arrest, and SA Hallowell told him that he was arrested as part of a drug investigation.

39.     Soon after his arrest, either Jackson asked members of law enforcement if he could call his girlfriend or members of law enforcement asked Jackson if he wanted to call his girlfriend.

40.      To the extent that he asked Jackson if he wanted to call his girlfriend, SA Hallowell did not do so in the hope that he could obtain the phone number for Jackson's girlfriend and add it to an application for a search warrant later, which would allow agents to search Jackson's three cell phones.

41.      SA Hallowell acknowledged that having Jackson's girlfriend's phone number was beneficial to the investigation. He also recalled the phone number due to the length of time Jackson and the other co-defendants were being investigated.

42.      SA Hallowell had been part of the criminal investigation team from 2022 into January 2023.

43.      Jackson's interaction with law enforcement at the time of his arrest on the street, including SA Hallowell, was not referenced in an FBI 302 Report SA Hallowell completed pertaining to Jackson's arrest.

44.      Subsequent to his arrest, Jackson was transported to FBI Headquarters.

**Jackson's Meeting/Interview with Law Enforcement at FBI Headquarters After His Arrest**

45.      SA Becker spoke to Jackson and other co-defendants subsequent to their arrests on January 25, 2023.

46.      SA Becker spoke to Jackson while Jackson was in an interview room containing a recording device at FBI Headquarters.

47.      SA Becker believed, pursuant to information he received prior to entering the interview room and speaking with Jackson, that Jackson had already invoked his right to speak to an attorney before or while being questioned. As such, SA Becker did not intend to ask Jackson any questions about the criminal charges forming the basis for his arrest while in the interview room.

48.     The recording device in the FBI interview room was operable, and it video- and audio-recorded SA Becker's conversation with Jackson on January 25, 2023.

49.     SA Becker and Detective William Schlosser of the City of Philadelphia Police Department spoke to Jackson in the interview room.

50.     Jackson was handcuffed to the table in the interview room during the entirety of the recorded conversation.

51.     After introducing himself and Detective Schlosser, SA Becker informed Jackson that he had been federally indicted on drug trafficking charges.

52.     SA Becker then informed Jackson that it was part of the FBI's policy to read him his *Miranda* rights even though he recognized that Jackson had already invoked his right to speak to an attorney.

53.     SA Becker read Jackson's *Miranda* rights from a standard form. He then asked Jackson to confirm that he did not want to speak to them, and Jackson confirmed nonverbally by quickly shaking his head from side to side.

54.     The standard form also contains a section which includes instructions to read to an arrestee (and have an arrestee read) relating to the arrestee waiving their *Miranda* rights and speaking to law enforcement.

55.     SA Becker did not read to Jackson the section of the form pertaining to waiving his *Miranda* rights and speaking to law enforcement because Jackson had already invoked his right to counsel.

56.     After reading an arrestee their *Miranda* rights, SA Becker does not always read the waiver-of-rights portion of the form to an arrestee even when that arrestee is willing to waive their *Miranda* rights and speak to law enforcement without an attorney present. In this regard, while

interviewing Jackson's co-defendants, Cesar Maldonado and Raphael Sanchez, SA Becker did not read that portion of the form or ask the co-defendants to read it.[18] Yet, he had read them their *Miranda* rights and they affirmatively consented to waive those rights and speak to law enforcement.

57.     Detective Schlosser asked Jackson if he had any questions about his *Miranda* rights, and Jackson again nonverbally responded in the negative by quickly shaking his head from side to side.

58.     SA Becker provided Jackson with a copy of his arrest warrant in case Jackson wanted to review it.

59.     SA Becker and Detective Schlosser mentioned to Jackson that he had been federally indicted on drug trafficking charges, conspiracy to distribute narcotics, and a "school charge."

60.     Detective Schlosser pointed out to Jackson where on the arrest warrant paperwork he could see the potential sentences for his charges. He pointed out to Jackson that he was looking at a mandatory minimum of ten years' incarceration.

61.     Jackson was permitted to take the arrest paperwork with him after leaving the interview room.

62.     SA Becker asked Jackson whether law enforcement had obtained a phone from him and whether Jackson needed any numbers from the phone.

63.     Jackson indicated that law enforcement had obtained a phone from him, and he stated that he needed a number from the phone. However, he then stated that he had written his girlfriend's number on something and placed it in his wallet.

---

[18] Jackson introduced the video recordings of the interviews of Mr. Maldonado and Mr. Sanchez as Defense Exhibits 1 and 2.

64.     Jackson then pulled his wallet out of one of his pockets and found the piece of paper upon which he had written his girlfriend's telephone number. SA Becker gave Jackson a pen so he could transfer that number onto the paperwork Jackson could take with him upon leaving the interview room.[19]

65.     SA Becker asked Jackson whether he would like them to give his wallet to his girlfriend, and Jackson said he would like them to do so.

66.     SA Becker then asked Jackson whether he would want to call his girlfriend. Jackson said he would like to call her, and SA Becker gave Jackson his work cell phone so Jackson could make the call on speakerphone.

67.     SA Becker informed Jackson that he would be going to the United States Marshals where they would take his picture and book him again. He also explained that Jackson would be seeing a judge tomorrow, and he gave Jackson information about where and when that would occur so Jackson could write it down and tell his girlfriend.

68.     SA Becker offered to give his work number to Jackson in case his girlfriend wanted to talk to SA Becker for any reason.

69.     It was not unusual for SA Becker to give his work number to family members of arrestees.

70.     SA Becker told Jackson to inform his girlfriend during the call that they would get his wallet to her.

71.     SA Becker obtained Jackson's girlfriend's phone number from Jackson and dialed it on his work cell phone.

---

[19] At one point in the video, Detective Schlosser noticed that Jackson had not fully copied his girlfriend's phone number onto the paperwork and notified Jackson as such. Jackson was then able to add the missing number onto his paperwork.

72.     Jackson spoke with his girlfriend and informed her that he would be in court the following day at 1:00 p.m. She informed him that she took off from work and would be present for the proceeding.

73.     Detective Schlosser told Jackson's girlfriend that they would get Jackson's wallet to her at the time of the court proceeding the following day.

74.     Jackson asked his girlfriend to search for a phone number of a particular attorney he wanted her to contact on his behalf.[20]

75.     Jackson's girlfriend asked about the location of his Jeep, and he pointed out to her that law enforcement had the key to it. Detective Schlosser and SA Becker informed her that they would give her the key to the vehicle at the time of the hearing.

76.     After the conversation between Jackson and his girlfriend ended, SA Becker asked Jackson if he had any questions for them, to which Jackson did not appear to respond. Detective Schlosser than asked Jackson if he was ready for them to "take [him] over," and Jackson said he was ready.

77.     Before they left the interview room, Detective Schlosser informed Jackson that they would not be trying to get consent from him to search his phone. He also informed Jackson that they would be keeping the phone and would be obtaining a search warrant for it.

78.     SA Becker asked Jackson if he wanted them to keep the phone in evidence after they were done with it or have it returned to his girlfriend. Jackson indicated that he wanted them to keep the phone in evidence.

---

[20] During the conversation, Jackson appears to reference the individual with whom he was speaking as his wife. The other information in the record does not indicate whether they were married.

79.     Detective Schlosser asked Jackson whether he wanted his or SA Becker's phone numbers, and Jackson responded by noting his girlfriend already had them. Detective Schlosser told Jackson that if he wanted to contact them, he could reach them via the main office number.

80.     As they were about to leave the interview room, SA Becker asked Jackson if he had anything else in his pockets. Jackson was very forthcoming and let them know he still had a package of weed in his front pocket along with several other items in other pockets.

81.     Jackson should have been subjected to a more thorough search prior to entering the interview room. In other words, he should not have still had his wallet, the package of weed, or any other items in his pockets at the time of the interview.

82.     SA Becker believes that every part of the conversation he and Detective Schlosser had with Jackson in the interview was permitted as part of the intake/booking process.

**The Warrant to Search Jackson's Three Cell Phones Seized at the Time of His Arrest**

83.     On March 17, 2023, SA Hallowell applied to United States Magistrate Judge Richard A. Lloret for a search warrant to search Jackson's three cell phones seized at the time of his arrest, which were still the possession of law enforcement. *See* Gov't Ex. 20.

84.     In the application, SA Hallowell stated that the search was related to violations of 18 U.S.C. §§ 922, 924 and 21 U.S.C. §§ 841, 843, 846. *See id.* He described the offenses as: "Narcotics trafficking; use of communication facility to facilitate narcotics trafficking; conspiracy to distribute narcotics; felon in possession of firearm; [and] possession of a firearm in furtherance of narcotics trafficking." *Id.* He also stated that the basis of the search of the cell phones under Federal Rule of Criminal Procedure 41(c) was for (1) "evidence of a crime" and (2) "contraband, fruits of crime, or other items illegally possessed." *Id.*

85.     SA Hallowell attached an affidavit to the search warrant application in which he described his background as follows:

1.     I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2501(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.     I am a Special Agent with the FBI and have been since 2013. Prior to becoming a Special Agent, I was a geospatial intelligence analyst for the National Geospatial-Intelligence Agency from 2006 - 2013. I have received specialized training from the FBI Academy located in Quantico, Virginia, regarding the investigation and identification of various crimes to include narcotics trafficking. I have conducted physical surveillance, debriefed confidential sources, and participated in the execution of search and arrest warrants. As a part of my official duties, I investigate criminal violations of the federal laws including, but not limited to, Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 848, 853, and 860. I have received specialized training in the enforcement of laws concerning controlled substances and narcotics trafficking organizations.

By virtue of my employment as a Special Agent, I have performed various tasks, which include, but are not limited to:

a.   Functioning as a surveillance agent and thereby observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs;

b.   Participating in the tracing of monies and assets gained by drug traffickers from the illegal sale of drugs (laundering of monetary instruments);

c.   Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and laundering of monetary instruments; and,

d.   Functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments.

e.   Through my training, education, and experience, I have become familiar with the manner in which persons involved in drug trafficking conceal the following in their vehicles: caches of drugs, financial instruments, jewelry, other items of value, proceeds of drug transactions, firearms, and large sums of money derived from drug trafficking activities.

*Id.*

86.     In his affidavit, SA Hallowell described the property to be searched as follows:

[A] pink Apple iPhone IMEI 356 710 088 485 788 ("TARGET TELEPHONE 1");
a black Apple iPhone IMEI 354 155 257 428 100 ("TARGET TELEPHONE 2"); a
blue Apple iPhone IMEI 350 342 024 818 439 (TARGET TELEPHONE 3")
(collectively the "TARGET TELEPHONES"). The TARGET TELEPHONES are
further described in Attachment A. The TARGET TELEPHONES were recovered
during the arrest of SHARIF JACKSON on January 25, 2023, near his residence
located at 600 Righters Ferry Rd, Bala Cynwyd, Pennsylvania (PA) 19004. All
three phones were in his pockets at the time of his arrest. . . . The TARGET
TELEPHONES are currently located at FBI Philadelphia Division, 600 Arch Street,
Philadelphia, Pennsylvania.

*Id.*[21]

87.     In his affidavit, SA Hallowell described the scope of the searches of the cell phones

as follows:

. . . The telephone [sic] listed in Attachment A may be searched for evidence
of violations of Title 21, United States Code, Sections 841, narcotics trafficking,
Title 21, United States Code, Section 843, use of communication facilities to
facilitate narcotics trafficking, Title 21, United States Code, Sections 846,
conspiracy to distribute narcotics, Title 18, United States Code, Sections 922(g)
felon in possession of a firearm, and Title 18, United States Code, Sections 924(c)
possession of a firearm in furtherance of narcotics trafficking, including:

a.   Electronic communications relating to the criminal activity,

---

[21] Attachment A to the application/affidavit stated as follows:

The TARGET TELEPHONES to be searched are:

1. TARGET TELEPHONE 1, a pink iPhone with IMEI 356 710 088 485 788

2. TARGET TELEPHONE 2, a black iPhone with IMEI 354 155 257 428 100

3. TARGET TELEPHONE 3, a blue iPhone with IMEI 350 342 024 818 439

This warrant authorizes the forensic examination of the TARGET TELEPHONES
for the purpose of identifying the electronically stored information described in
Attachment B. All of the phones are in the possession of the FBI at 600 Arch St,
Philadelphia PA 19106.

*Id.*, Attachment A.

b. Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed, telephone numbers of incoming, outgoing or missed calls, text messages, schedule entries, stored memoranda, videos, social networking sites and digital photographs,

c. Lists of customers and related identifying information,

d. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions,

e. Any information related to sources of controlled substances, including names, addresses phone numbers, and any other identifying information,

f. Any information related to the methods of trafficking in controlled substances[,]

g. Any information recording domestic and international schedule or travel related to the described criminal activity, including any information recording a nexus to airport facilities, airport security, or airlines,

h. All bank records, checks, credit cards, credit card bills, account information, and other financial records,

i. All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system,

j. Stored memoranda; stored text messages, including drafts; stored voicemail messages; stored electronic mail; stored photographs; stored audio; and stored video,

k. Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

l. Evidence of the attachment of other devices,

m. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

n. Evidence of the times the device was used,

o. Passwords, encryption keys, and other access devices that may be necessary to access any of the devices,

34

p.  Records of or information about Internet Protocol addresses used by the device,

q.  Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, as well as evidence of the posting of videos, photos, or any material relevant to these crimes to any social networking site[,]

r.  Evidence of user attribution showing who used or owned the electronic devices at the time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history[, and]

s.  [A]ny other information pertaining to the possession, receipt, and/or distribution of narcotics that were transmitted, stored, or received using the item to be searched.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

*Id.*

88.    In the affidavit, SA Hallowell set forth the information upon which he believed that there was probable cause to search Jackson's cell phones. In completing the affidavit of probable cause, SA Hallowell based it upon his "personal knowledge, information provided by confidential human sources (CHS), surveillance, the execution of a search warrant conducted by law enforcement officers involved in this investigation, and my experience and training." *Id.* He also explained that "[b]ecause this affidavit is being submitted for the limited purpose of establishing probable cause for the search of the TARGET TELEPHONES, [he did] not set forth each and

every fact learned during the course of this investigation, but only those facts necessary to establish

such probable cause." *Id.*

89.     The affidavit contained the following averments in support of a finding of probable

cause:

> 7.      This application is submitted in support of an FBI investigation into a violent drug trafficking organization referred to as the Gillard Street Gang ("GSG"), SHARIF JACKSON ("JACKSON"), and others known and unknown, believed to operate primarily in the Kensington and Port Richmond sections of Philadelphia within the Eastern District of Pennsylvania. The United States, including the FBI, is conducting a criminal investigation of the drug trafficking organization regarding violations of federal drug trafficking and firearm offenses, including violations of Title 21, United States Code, Section 841, narcotics trafficking; Title 21, United States Code, Section 843, use of communication facilities to facilitate narcotics trafficking offenses; Title 21, United States Code, Section 846, conspiracy to distribute narcotics; Title 18, United States Code, Section 922(g) felon in possession of a firearm, and Title 18, United States Code, Sections 924(c) possession of a firearm in furtherance of narcotics trafficking.

> 8.      On July 7, 2022, Law Enforcement utilized a CHS to conduct controlled narcotics purchase from DIANE GILLARD ("GILLARD") and JACKSON in which the CHS purchased approximately one pound of methamphetamine from GILLARD and JACKSON for $3,800.[22] The CHS purchased the pound of methamphetamine in the Port Richmond neighborhood of Philadelphia, near the 2900 block of Tulip Street. The CHS obtained audio and video recordings of the controlled purchase. Investigators monitored a live audio transmission, a live video transmission, and conducted physical surveillance of the purchase. The CHS was searched by investigators before and after the controlled purchase for undisclosed drugs, cash, and contraband with negative results. The following details of the purchase were determined through a combination of a debrief of the CHS post purchase, monitoring of the live audio and video transmissions, physical surveillance, and review of recorded audio and video footage.

> 9.      The CHS had purchased narcotics from GILLARD multiple times before this date. GILLARD was known to act as a "middleman" between the narcotics source of supply and the CHS. The CHS would order narcotics from

---

[22] The CHS has no criminal convictions. The CHS has successfully performed controlled narcotics purchases in the past and the CHS's reporting has proven to be truthful and verifiable. The CHS has received financial compensation for the actions and information he/she has provided to the FBI.

GILLARD and GILLARD would then reach out to various drug dealers she knew to obtain the requested narcotics. On this date, GILLARD was having difficulty finding a source of supply to provide the CHS with a pound of methamphetamine. Review of the CHS's recorded interactions with GILLARD during the drug buy showed that at approximately 5:44 PM, GILLARD received an incoming FaceTime video call from "Bro Reef." This observation was possible because GILLARD had audio alerts on her phone enabled and it was audible on the CHS's recording. Law enforcement knows that "Reef" is a nick name for JACKSON. The following is what could be heard from the conversation between JACKSON and GILLARD:

GILLARD: Yo yo, where you at? How fast can you get me a jawn bro?

JACKSON: Um, I'll be there in like 20 minutes.

GILLARD: Lets go lets get it.

JACKSON: Where I gotta come to?

GILLARD: You gotta come to Tulip, you gotta come to Tulip.

JACKSON: alright I'm on my way right now.[23]

GILLARD: Its gotta be chunky man. It gotta look…

JACKSON: all my shit chunky, when I get to the crib I'll….. all of them and you

can pick which one you want.[24]

GILLARD: Say no more, lets go.

JACKSON: Alright.

GILLARD: Alright.

10.    From my training and experience and my knowledge of the context of this FaceTime video conversation, I know that when GILLARD was asking how fast JACKSON could get her a "jawn", she was referring to a quantity of narcotics. I also know that when GILLARD and JACKSON were discussing the substance being "chunky" it was in reference to the methamphetamine needing to be larger sized crystals of methamphetamine, which is indicative of the methamphetamine being of higher quality and purity.

---

[23] Due to the quality of the audio recording not all of the conversation was intelligible.
[24] Due to the quality of the audio recording not all of the conversation was intelligible.

11.     At approximately 6:21 PM, following this FaceTime call, JACKSON arrived near the 2900 block of Tulip Street, driving a black Jeep SUV bearing PA license plate LYE1251. Government database checks show this vehicle is registered to JACKSON. At the same time, GILLARD got into the CHS's vehicle. GILLARD then exited the CHS's vehicle and interacted with JACKSON through the front passenger door of the black Jeep. GILLARD left the black Jeep and returned to the CHS's vehicle. GILLARD now had the pound of methamphetamine the CHS had ordered and sold it to the CHS for $3,800. GILLARD then exited the CHS's vehicle and went back to the black Jeep and interacted with JACKSON. GILLARD walked away and the black Jeep departed. Laboratory analysis confirmed that the substance was methamphetamine with an approximate weight of 436.5 grams.

12.     FBI obtained a search warrant, 22-mj-1189, for GILLARD's iCloud account on July 28, 2022, and served it on the same date. Apple returned records on August 11, 2022. The iCloud returns contained a contacts section. The contacts section contained TARGET TELEPHONE 1 and it was assigned the contact name "Bro Reef" as shown below.



The returns also contained FaceTime call logs. A review of the FaceTime call logs show that on July 7, 2022, GILLARD had multiple FaceTime calls with TARGET TELEPHONE 1 leading up to and during the controlled drug buy described above. The graphic below shows the FaceTime call logs.

local time

| | natip | source handle | recipient handle |
|---|---|---|---|
| 6/19/22 1:36 PM | 107.123.20.3 | P:+12675974226 | P:2672768385 |
| 6/24/22 9:16 AM | 107.123.20.1 | P:+12675974226 | P:+12672989733 |
| 7/7/22 4:45 PM | 107.123.20.162 | P:+12675974226 | P:+12155521092 |
| 7/7/22 5:34 PM | 107.123.20.163 | P:+12675974226 | P:2155521092 |
| 7/7/22 5:47 PM | 107.123.20.161 | P:+12675974226 | P:+12155521092 |
| 7/7/22 5:52 PM | 107.123.20.161 | P:+12675974226 | P:+12155521092 |
| 7/7/22 6:01 PM | 107.123.20.161 | P:+12675974226 | P:+12159828959 |
| 7/7/22 6:12 PM | 107.123.20.161 | P:+12675974226 | P:2155521092 |
| 7/7/22 6:19 PM | 107.123.20.162 | P:+12675974226 | P:+12155521092 |

13.     On October 12, 2022, law enforcement utilized the CHS to conduct another controlled drug buy from GILLARD and JACKSON. On this buy, the CHS purchased approximately two pounds of methamphetamine for $6,600 in the Port Richmond neighborhood of Philadelphia, on the 2900 block of Tulip Street. The CHS obtained audio and video recordings of the controlled buy and law enforcement monitored a live audio transmission of the buy while conducting physical surveillance of the buy. The CHS and his/her vehicle were searched by law enforcement pre and post buy for undisclosed drugs, cash, and contraband with negative results. The following details of the buy were determined through a combination of a debrief of the CHS post buy, monitoring the live audio transmission, physical surveillance, remote electronic surveillance, aerial surveillance, and review of the recorded audio and video of the buy.

14.     At 4:00 PM on October 12, 2022, your affiant drove past the Uceta Family Grocery store located at 2981 Memphis Street, Philadelphia PA, and observed GILLARD standing in front of the store. GILLARD was wearing black pants, a light toned shirt, a black coat, and a white hat, she did not have a bag. At 4:22 PM, the CHS placed a call to GILLARD and ordered two pounds of methamphetamine. GILLARD informed the CHS that she was about to make a call to order the methamphetamine. At 4:51 PM, the CHS parked on the 2900 block of Tulip Street as instructed by GILLARD. At 5:48 PM, GILLARD walked up to the CHS's vehicle and gestured to the CHS indicating that she was about to get the methamphetamine. At 5:51 PM, JACKSON's black Jeep bearing PA license plate LYE1251 parked near 2307 Ann Street. GILLARD walked up to the black Jeep, opened the front passenger door, interacted with an occupant in the vehicle (subsequently identified as JACKSON), and was observed adjusting clothing. JACKSON then got out of the rear right passenger door and appeared to smoke a cigarette and GILLARD walked back towards the CHS. JACKSON was wearing a fluorescent green work t-shirt and a black baseball hat. As GILLARD was walking back towards the CHS she was observed to be wearing a single strap black bag

39

across her chest that she did not have before she met with JACKSON at the black Jeep.

15.    At 5:54 PM, GILLARD opened the front passenger door of CHS's vehicle. GILLARD then removed two pounds of methamphetamine from the bag she got from JACKSON and sold it to the CHS for $6,600.[25] The CHS gave the money to GILLARD in a red Wawa bag. GILLARD returned to the black Jeep and entered the front passenger seat with the red Wawa bag. Three minutes later, GILLARD exited vehicle and walked away. JACKSON then got out of the rear passenger door and entered the driver seat of the black Jeep and departed.

16.    At approximately 7:30 PM, a uniformed Philadelphia Police Department (PPD) Officer in a marked PPD vehicle pulled over JACKSON's black Jeep. The Officer's body camera was turned on during the event. Review of the Officer's body camera footage showed that JACKSON was indeed the driver of the black Jeep, and he was still wearing the fluorescent green T-shirt and black hat observed by surveillance earlier in the day. JACKSON also provided the Officer with a Pennsylvania driver's license bearing the name SHARIF JACKSON.

17.    On January 24, 2023, a federal grand jury returned a 50-count indictment charging members of GSG, including JACKSON, with federal drug trafficking and firearm offenses. JACKSON was charged with conspiracy to distribute methamphetamine, phencyclidine ("PCP"), fentanyl, cocaine base ("crack"), cocaine, and heroin, in violation of 21 U.S.C. § 846 (Count 1); distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Counts 4, 6, 10, 17, 21, 43); and, distribution of 50 grams or more of methamphetamine within 1,000 feet of a protected location, in violation of 21 U.S.C. §§ 860(a), 841(a)(1), (b)(1)(A) (Counts 5, 7, 11, 18, 22, 44).

18.    The indictment alleges that members of GSG, including JACKSON, used their cellular telephones to coordinate with each other and with those outside the drug trafficking organization, to acquire, transport, and distribute controlled substances throughout Philadelphia.

19.    On January 25, 2023, JACKSON was arrested pursuant to an arrest warrant for the January 24, 2023, indictment. During the arrest of JACKSON, the TARGET TELEPHONES were recovered from his pants pocket. At the time of the arrest your affiant could see a text message on the screen of TARGET TELEPHONE 3, your affiant was not able to capture a picture of the text message before the phone auto-locked and the message disappeared from the screen, but the context of the text was "bro call me…..I'm cooked". From my training and experience I know that this was likely a message from a co-conspirator that was nervous they would be arrested since law enforcement had arrested multiple co-

---

[25] Laboratory analysis confirmed that the substance was methamphetamine with an approximate weight of 883.1 grams.

conspirators and associates of JACKSON that morning; this indicated that JACKSON utilized TARGET TELEPHONE 3 to communicate with co-conspirators in narcotics trafficking.

20.    Immediately after his arrest JACKSON asked if he could call his girlfriend, Zakeya Rodriguez, and agents allowed him to call her. Agents dialed her phone number, 718-924-7870, from TARGET TELEPHONE 1 and monitored JACKSON's conversation with her. FBI issued administrative subpoenas for TARGET PHONES following JACKSON's arrest. Analysis of the returned records showed that all TARGET PHONES had been active and in use for months prior to and leading up to JACKSON's arrest. Analysis also showed that all TARGET PHONES had contact with Rodriguez's phone. Additionally, all TARGET PHONES were in contact with phone number 215-280-0259. Research showed that this phone was identified in multiple SARs (Suspicious Activity Report) as attributable to Timothy Tate. The SARs stated that Tate was involved in apparent structuring, multiple withdrawals of cash under $10,000 from a bank account on the same day. Tate had a significant criminal history with multiple convictions for drug charges. In my training and experience I know that it is common for drug traffickers to engage in structuring in attempts to avoid law enforcement scrutiny while "cleaning" the proceeds of drug trafficking. The fact that all TARGET PHONES were on JACKSON's person when he was arrested, that they were all in contact with JACKSON's significant other's phone, and that all were in contact with a phone identified in SARs shows that JACKSON was utilizing all TARGET PHONES.

## CELLULAR PHONE EVIDENCE IN NARCOTICS INVESTIGATIONS

21.    Based on my training and experience, I know that individuals involved in narcotics trafficking often maintain more than one phone or more than one SIM card device to have multiple avenues to facilitate drug trafficking activities, and in an attempt to avoid detection by law enforcement. I am aware that individuals involved in drug trafficking often utilize prepaid cellular telephones which do not maintain specific subscriber information, and/or use phones subscribed to in the name of third person to mask their direct linkage to telephones utilized in furtherance of drug trafficking activities. Further, those involved in drug trafficking often change SIM cards to make it difficult for law enforcement to determine their records. Based on my training and experience, I know that individuals involved in drug trafficking also frequently switch telephone numbers and/or phones. Despite the constant switching of active telephone numbers, drug traffickers often keep old phones.

22.    Based on my training and experience, I know that drug traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their drug transactions. For example, I know that drug traffickers often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices,

such as cellular telephones, to be used in furtherance of their drug trafficking activities.

23. Specifically, I know that those involved in drug trafficking communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in drug trafficking communicate with associates using cellular telephones and tablets to send e-mails and text messages and communicate via social media networking sites. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

24. Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts. I am aware that drug traffickers frequently list drug associates in directories, often by nickname, to avoid detection by others. Such directories as the ones likely contained in the seized cellular telephone, are one of the few ways to verify the numbers (i.e., telephones, etc.) being used by specific traffickers.

25. In addition, I know that those involved with narcotics trafficking often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones. This evidence would show associations between accomplices, i.e. photographs of accomplices and/or individuals common to co-conspirators. I am also aware that narcotics traffickers often take photographs or make videos of drugs, drug proceeds and firearms with their cellular telephones and tablets. Based on my training and experience, those who commit these crimes often store these items on their phones to show to associates, and/or to upload to social media.

26. Furthermore, based on my training and experience and the training and experience of other agents, I know that drug traffickers often use a cellular phone's internet browser for web browsing activity related to their drug trafficking activities. Specifically, drug traffickers may use an internet search engine to explore where banks or mail delivery services are located, or may use the internet to make reservations for drug-related travel. In addition, I know that drug traffickers also use their cellular telephone's internet browser to update their social networking sites to communicate with co-conspirators, and to display drugs and drug proceeds or to post photographs of locations where they have traveled in furtherance of their drug trafficking activities.

27. In addition, drug traffickers sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in

furtherance of their drug trafficking activities. These electronic devices may also contain GPS navigation capabilities and related stored information that could identify where these devices were located.

28.     Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used. In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN). The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy. In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

## **Electronic Storage and Forensic Analysis**

29.     <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET TELEPHONES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30.     As described above and in Attachment B, this application seeks permission to search and seize things that the TARGET TELEPHONES might contain, in whatever form they are stored. As used herein, the term "electronic device" includes any electronic system or device capable of storing or processing data in digital form, in this case referring specifically to wireless or cellular telephones.

31.     Based on my knowledge, training, and experience, as well as information related to me by others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices. In particular, I know that electronic devices, including cellular telephones used by drug traffickers, are likely to be repositories of evidence of crimes. I know that an electronic device such as a cellular telephone may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

32.     Furthermore, I know that electronic devices, such as cellular telephones, can store information for long periods of time. Examples of such information include text and multimedia message conversations, call history, voice mail messages, e-mails, photographs, and other data stored on the device. Similarly,

I know from my training and experience that when cellular telephones are used to access the internet, a browser history is also frequently stored for some period of time on the electronic device. This information can sometimes be recovered with forensic tools.

33.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that searching electronic devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of electronic devices and software programs in use today that specialized equipment is sometimes necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of electronic devices, operating systems, or software applications that are being searched.

34.    I am also aware that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

35.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), electronic devices can contain other forms of electronic evidence as well. In particular, records of how an electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the electronic devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not

currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the electronic device was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and can require substantial time.

36.    Further, evidence of how an electronic device has been used, what it has been used for, and who has used it, may be the absence of particular data on an electronic device. For example, to rebut a claim that the owner of an electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device. Evidence of the absence of particular data on an electronic device is not segregable from the electronic device. Analysis of the electronic device as a whole to demonstrate the absence of particular data can require specialized tools and a controlled laboratory environment, and can require substantial time.

37.    Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, law enforcement officers and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a timeconsuming manual search through unrelated materials that may be co-mingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, law enforcement intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

38.    The TARGET TELEPHONES are currently in storage at FBI Philadelphia Division, 600 Arch Street, Philadelphia, Pennsylvania 19106. In my training and experience, I know that the TARGET TELEPHONES have been stored

in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET TELEPHONES first came into the possession of the FBI.

*Id.* (footnotes in original).[26]

90.    SA Becker does not believe that there were any misstatements in the application for a warrant to search Jackson's cell phones drafted by SA Hallowell.

### 3.    Applicable Law – Review of Search Warrants

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Absent exigent circumstances, investigating officers must obtain a warrant prior to executing a search of an individual's home. *See Payton v. New York*, 445 U.S. 573, 586 (1980). A warrant may issue only upon a determination by a neutral magistrate that, given the totality of the circumstances set forth in the affidavit, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," probable cause exists to support the proposed search. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause  supported by Oath or affirmation . . . ."). Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found" in the location described in the warrant. *Gates*, 462 U.S. at 238. This a "flexible, common-sense standard" which does not require proof that evidence is more likely than not to be recovered during the search. *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause is also a "fluid concept, turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232.

---

[26] The footnotes in the affidavit have been renumbered to correspond to the other footnotes in this memorandum opinion.

When considering a challenge to the validity of a search warrant, "the task of the reviewing court is not to conduct a *de novo* determination of probable cause." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). Likewise, the reviewing court "need not determine that probable cause actually existed[.]" *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). Instead, the reviewing court must decide whether the issuing magistrate had "a 'substantial basis' for finding probable cause." *Id.* (quoting *United States v. Jones*, 994 F.2d 1051, 1054 (3d Cir. 1993)). During this review, the court should "give great deference to the magistrate judge's probable cause determination." *Id.* (citations omitted). If a substantial basis exists to support the probable cause finding, the reviewing court must uphold that finding even if it or a "different magistrate judge might have found the affidavit insufficient to support a warrant." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993).

In addition, the reviewing court must confine itself "to the facts that were before the magistrate judge," and not "information from other portions of the record." *Id.* (quoting *Jones*, 994 F.2d at 1055). In other words, the reviewing court should only assess the facts within the four corners of the probable cause affidavit. *See United States v. Beatty*, 437 F. App'x 185, 187 (3d Cir. 2011). Moreover, "[t]he supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner." *Conley*, 4 F.3d at 1206. If, based on the foregoing, the reviewing court finds that the magistrate had a substantial basis for concluding that the warrant affidavit established probable cause, the court must uphold the warrant as valid. *See United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000); *see also United States v. Herrera*, No. CRIM. A. 15-22, 2015 WL 3536616, at *4 (E.D. Pa. June 5, 2015) ("Although the district court should not simply 'rubber stamp' the issuing judge's conclusions, *Whitner*, 219 F.3d at 296 (citing *Jones*, 994 F.2d at 1055), the Supreme Court has directed that 'doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to warrants.' [*United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citing *Gates*, 462 U.S. at 237 n.10).").], *aff'd sub nom.*, *United States v. Suarez-Arzon*, 664 F. App'x 180 (3d Cir. 2016).

### 4.   Analysis

Before addressing the parties' arguments on the instant Motion, the Court notes that "the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for [their] motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government," *id.*, where it needs to show by a preponderance of the evidence "that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *see United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) (indicating applicable burden is preponderance of the evidence). In this case, Jackson has failed to establish any basis for his Motion to Suppress, and has otherwise failed to satisfy his burden to show that evidence seized from his cell phones should be suppressed.

### a.   The Legality of Sergeant Linahan's Stop of Jackson's Jeep on October 12, 2022

As indicated above, Jackson contends that the traffic stop of his vehicle on October 12, 2022 was illegal. Jackson is mistaken. In this regard,

> [t]he Fourth Amendment lets "an officer ... conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The reasonable-suspicion standard applies whether the suspect is traveling on foot or by car. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006).
>
> Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673. The officer need articulate only a "'particularized and objective basis' for suspecting legal wrongdoing." *United*

> *States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting
> *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).
> To decide whether an officer could have reasonably suspected wrongdoing, we look
> at the totality of the circumstances. *Id.*

*United States v. Small*, 797 F. App'x 675, 677–78 (3d Cir. 2020).

Here, SA Becker had reasonable suspicion (and probable cause) that the sole individual operating the black Jeep on October 12, 2023, was involved in illegal drug distribution when he directed Sergeant Linahan to stop the Jeep to obtain identification from the driver. Even though Sergeant Linahan himself did not have the benefit of SA Becker's observations at the time he stopped the Jeep, reasonable suspicion still supported the stop because of the "collective knowledge doctrine." This doctrine provides that "the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest." *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010).[27] Thus, SA Becker's knowledge of what he observed during the controlled purchase was imputed to Sergeant Linahan when he stopped Jackson's Jeep. Consequently, since SA Becker had reasonable suspicion to stop the Jeep to obtain the operator's identification, so did Sergeant Linahan. *See United States v. Kaplan*, 526 F. App'x 208, 210, 214 (3d Cir. 2013) (concluding that knowledge obtained by two Pennsylvania State Troopers through wiretaps, indicating that individual would be transporting illegal narcotics by vehicle, was imputed

---

[27] In *Whitfield*, the Third Circuit explained that

> it would make little sense to decline to apply the collective knowledge doctrine in
> a fastpaced, dynamic situation such as we have before us, in which the officers
> worked together as a unified and tight-knit team; indeed, it would be impractical to
> expect an officer in such a situation to communicate to the other officers every fact
> that could be pertinent in a subsequent reasonable suspicion analysis.

634 F.3d at 745. The Third Circuit concluded that after "[a]pplying the collective knowledge doctrine here, there is little question that there was reasonable suspicion to seize Whitfield." *Id.*

to other Troopers who were directed to stop individual's vehicle and therefore supported finding of reasonable suspicion to stop vehicle).

> **b.**     **Alleged Misstatements in Affidavit of Probable Cause**

Regarding Jackson's contention about alleged misstatements in the affidavit of probable cause, he has failed to demonstrate that any such misstatements existed. Jackson first challenges the accuracy of a portion paragraph 20 in the affidavit of probable cause, which stated:

> Immediately after his arrest JACKSON asked if he could call his girlfriend, Zakeya Rodriguez, and agents allowed him to call her. Agents dialed her phone number, 718-924-7870, from TARGET TELEPHONE 1 and monitored JACKSON's conversation with her. FBI issued administrative subpoenas for TARGET PHONES following JACKSON's arrest. Analysis of the returned records showed that all TARGET PHONES had been active and in use for months prior to and leading up to JACKSON's arrest. Analysis also showed that all TARGET PHONES had contact with Rodriguez's phone.

Suppression Mot. at 7 (quoting Aff. in Supp. of Probable Cause at ¶ 20). More specifically, he claims this information in paragraph 20 is untrue because of what occurred during Jackson's interview at FBI Headquarters after his arrest. *See id.* Unfortunately, Jackson appears to attribute the challenged portion of paragraph 20, which references what occurred at the time of Jackson's arrest on January 25, 2023, to what occurred at FBI Headquarters later in the day. Additionally, SA Hallowell credibly testified about Jackson calling his girlfriend shortly after being arrested, and SA Becker testified credibly about not perceiving any inaccuracies in the affidavit of probable cause. Therefore, Jackson has failed to show that the challenged portion of paragraph 20 of the affidavit was false.

Jackson also challenges the accuracy of a portion of paragraph 19 of the affidavit of probable cause, which provided:

> [T]he context of the text was "bro call me…..I'm cooked". From my training and experience I know that this was likely a message from a co-conspirator that was nervous they would be arrested since law enforcement had arrested multiple co-

> conspirators and associates of JACKSON that morning; this indicated that JACKSON utilized TARGET TELEPHONE 3 to communicate with co-conspirators in narcotics trafficking.

*Id.* at 9 (quoting Aff. in Supp. of Probable Cause at ¶ 19). Jackson claims that because the alleged text was not produced as part of the "phone dump" of Target Telephone 3, the information in the affidavit is inaccurate. *See id.*

During the evidentiary hearing, SA Hallowell credibly testified that he saw a text message stating something to the equivalent of "bro call me…..I'm cooked" on a cell phone recovered from Jackson at the time of his arrest. Jackson's counsel cross-examined SA Hallowell and pointed out that this text message was not included in a 302 Report he prepared relating to Jackson's arrest. Even though the text message was not included in the 302 Report, and may not have been part of the "phone dump" of the phone identified in the affidavit, does not ipso facto mean that SA Hallowell did not see the text message. Instead, it signifies that Jackson's counsel will have a basis to cross-examine SA Hallowell about the accuracy of his statement before the jury at trial. Thus, Jackson has failed to show that the challenged portion of paragraph 19 of the affidavit of probable cause is inaccurate.[28]

### c. Whether Law Enforcement's Conversation with Jackson After He Apparently Invoked His Right to Counsel Violated the Sixth Amendment

Jackson asserts that evidence obtained via the search warrant for his phones should be suppressed because any statements he made while in custody at FBI Headquarters violated his rights under *Miranda*, the Fifth Amendment, and the Sixth Amendment. *See id* at 8. He also asserts

---

[28] Near the end of the evidentiary hearing, counsel seemingly discussed the possibility that the cell phone recovered from Jackson which showed the text message at issue may not have been Target Telephone 3 and, instead, may have been Target Telephone 2. If the information in the affidavit was inaccurate insofar as it mistakenly referenced Target Telephone 3, it is a minor inaccuracy and would not affect the Court's ultimate resolution of Jackson's Motion to Suppress.

that "the affidavit of probable cause upon which the magistrate relied is fruit of the poisonous tree and should be suppressed." *Id.* As explained below, Jackson is not entitled to relief under either assertion.

SA Becker and Detective Schlosser's conversation with Jackson at FBI Headquarters did not violate *Miranda*, the Fifth Amendment, or the Sixth Amendment as he contends. The Court recognizes that

> [b]efore beginning an interrogation, law enforcement must warn suspects in custody of certain fundamental rights. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These warnings "dispel the compulsion inherent in custodial surroundings," and therefore apply only when a suspect is in custody. *Id.* at 458, 86 S.Ct. 1602. Likewise, only individuals in custody are entitled to have all questioning cease when they invoke their right to counsel. *See* [*Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)].

*United States v. Adams*, 637 F. Supp. 3d 282, 293 (E.D. Pa. 2022).

If an individual in custody has invoked their right to have counsel present during any interrogation,

> "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *see also Alston v. Redman*, 34 F.3d 1237, 1243 [(3d Cir. 1994)] ("once a suspect has asked for the assistance of counsel, it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures [of custodial interrogation] and not the purely voluntary choice of the suspect") (internal quotation marks and citations omitted). However, if a suspect has invoked the right, one may still be subject to questioning if one then (1) "initiate[s] the conversation with the authorities" and (2) the waiver ... [is] knowing and voluntary." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)). The first factor, initiation of the conversation by the defendant, was defined by a Supreme Court plurality in *Oregon v. Bradshaw* as an inquiry which "evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1046. A suspect's question of "[w]hat is going to happen?" was found to be an initiation and "not merely a routine inquiry incidental to her custodial relationship." *Velasquez*, 885 F.2d at 1085.

> A "valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, 384 U.S. at 475. However, "[a]n express written or oral statement of waiver ... is not inevitably either necessary or sufficient to establish waiver" and "in at least some cases[,] waiver can be clearly inferred form the actions and words of the person interrogated." *Butler*, 441 U.S. at 373. The prosecution is required to prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (citations omitted).

*United States v. Beasley*, Crim. A. No. 20-361, 2023 WL 5984285, at *23 (E.D. Pa. Sept. 14, 2023).

Here, SA Becker and Detective Schlosser recognized (or at least believed) that Jackson had requested counsel before any further interrogation could occur. Jackson also did not waive his right to counsel affirmatively during his conversation SA Becker and Detective Schlosser, and it does not appear that he initiated any conversation with them. Therefore, the Court cannot conclude that Jackson waived his right to counsel during that conversation, which would have permitted SA Becker and Detective Schlosser to lawfully question him. Nevertheless, Jackson is not entitled to the suppression of any statements he made during that conversation because there was no Fourth Amendment violation insofar as he was never "interrogated" without counsel present.

"Questions normally attendant to arrest and custody do not constitute interrogation for *Miranda* purposes." *United States v. Mitchell*, 58 F. App'x 14, 16 (4th Cir. 2003) (citing *South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983); *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Thus, "there is a 'routine booking exception' to the requirements of [*Miranda*]." *United States v. Bishop*, 66 F.3d 569, 572 n.2 (3d Cir. 1995) (citing *United States v. Horton*, 873 F.2d 180, 181 n.2 (8th Cir. 1989)); *see also United States v. Kent*, Crim. A. No. 18-417, 2021 WL 816905, at *4 (E.D. Pa. Mar. 3, 2021) ("[B]ooking questions regarding 'name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation' unless the questions are 'designed to elicit incriminatory admissions.'" (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601

& n.14 (1990))). "The booking exception can apply to questioning even after a defendant has invoked [their] right to counsel if the questions are biographical questions not reasonably likely to elicit an incriminating response." *Soto v. Cisneros*, Case No. 20-cv-01115, 2021 WL 3913046, at *14 (N.D. Cal. Sept. 1, 2021) (citing *United States v. Zapien*, 861 F.3d 971, 976 (9th Cir. 2017)).

While the questions asked to Jackson on January 25, 2023 may not qualify as typical booking questions insofar as SA Becker and Detective Schlosser were not asking Jackson about his height, weight, or age, their questions would not constitute "interrogation" because there is no indication that SA Becker and Detective Schlosser should have known that their questions were "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. These appear to be all the questions asked to Jackson while he was in the interview room at FBI Headquarters in the order in which they were asked to him:

- From SA Becker: "Are you good with that?"[29]

- From SA Becker: "You don't want to talk without an attorney?" To which Jackson responded affirmatively in a nonverbal fashion.

- From Detective Schlosser: "You don't have any questions about that obviously, pretty straight forward, right?"[30]

- From SA Becker: "This is a copy of your arrest warrant, if you want to take a look at it?"[31]

- From Detective Schlosser: After noting one page of the warrant paperwork contained information about potential sentences for the charged offenses, he asked, "Is yours life?"[32]

---

[29] At the time of this question, SA Becker was referencing his plan to read Jackson his *Miranda* rights from the form in front of him, give him an overview of the charges, and then get him out of there.

[30] Asked to Jackson after SA Becker read him his *Miranda* rights.

[31] It is arguable that this was a statement rather than a question. In response, Jackson indicated he wanted to see the arrest warrant paperwork.

[32] Jackson responded to this question by pointing out that the paperwork said ten years to life.

- From Detective Schlosser: "Do you want to take [the arrest warrant paperwork] over to FDC?"

- From SA Becker: "Did we get a phone from you?"[33]

- From SA Becker: "Do you want any numbers out of [the phone]?"[34]

- From SA Becker: After Jackson revealed he still had his wallet on him, he was asked, "You have your wallet still?"

- From SA Becker: "Is there anything in [the wallet] or just the number?"[35]

- From SA Becker: "Is there any cash in [the wallet]?"

- From SA Becker: "Do you want us to return [the wallet] to your girl?"[36]

- From SA Becker: "Do you want to call [your girlfriend] real quick?"[37]

- From Detective Schlosser: "Can [your girlfriend] make it [to his hearing the following day at 1 p.m. before a Magistrate Judge], like is she off, or is she going to be at work tomorrow at that time?"

- From SA Becker: "What's the number [for your girlfriend]?"[38]

- From Detective Schlosser: Upon hearing the phone number for Jackson's girlfriend, he asked, "Is that a burner or is she from out of town?"

- From SA Becker: "What's [your girlfriend's] name?"

- From Detective Schlosser: "Did you want to write something else down?"

- From SA Becker: "Do you want more numbers out of your phone?"[39]

- From SA Becker: "Any questions for us?"

---

[33] Jackson responded affirmatively.
[34] Jackson responded affirmatively.
[35] Jackson responded that there were cards and sh** in the wallet.
[36] Jackson responded affirmatively.
[37] Jackson responded affirmatively.
[38] In response, Jackson provided SA Becker with his girlfriend's phone number, which SA Becker used to call her from his work cell phone.
[39] Jackson responded in the negative.

- From Detective Schlosser: "Want us to just get ready and we can take you over [to the United States Marshals]?"

- From Detective Schlosser: "You good?"

- From SA Becker: After mentioning that they will obtain a search warrant to search his phone, he asked: "Are you good with us returning [the phone] to [your girlfriend] as well, or do you want us to keep it in evidence?"[40]

- From Detective Schlosser: "You want a contact number for either of us or if you want your lawyer to reach out?"[41]

- From SA Becker: "You alright bro? All good?"

- From SA Becker: "Do you have anything else in your pockets?"[42] "You have nothing else in your pockets, right?" "Did they search you at all?"

- From SA Becker: "Are you good with us giving [your girlfriend] all the cash and everything?"

- From Detective Schlosser: "You got like a Dove?"[43]

- From SA Becker: "So you got nothing else on you?"

- From Detective Schlosser: "You done with the water? Because you can't take it with you."

Gov't's Ex. 21.

As illustrated by just a cursory review of these questions, there is nothing about them showing that SA Becker or Detective Schlosser should have known that they were reasonably likely to elicit an incriminating response. It also does not appear that Jackson provided any incriminating responses to their questions. The closest question may have been when they asked

---

[40] SA Becker asked Jackson about whether he wanted them to keep the phone in evidence a second time shortly thereafter. Jackson indicated that he wanted them to keep the phone in evidence.

[41] Jackson responded in the negative.

[42] This was asked as they were preparing to leave the interview room. This is the point where Jackson was forthcoming and acknowledged having a package of weed in his pocket along with other items.

[43] It is unclear what Detective Schlosser meant by "Dove." He asked the question while Jackson was searching his pockets.

him whether he had anything else in his pockets, but even from the look on their faces in the video recording, there is no indication that SA Becker and Detective Schlosser expected Jackson to say he had weed on him (which was not charged anyway). Accordingly, no constitutional violation occurred because Jackson was not subject to interrogation after he invoked his right to have counsel present prior to the communication in the interview room. Consequently, there was no evidence produced during that conversation that this Court should suppress as fruit of the poisonous tree. *See United States v. Dowdell*, 70 F.4th 134, 139 (3d Cir. 2023) (explaining that any "[e]vidence obtained through unreasonable searches and seizures must be suppressed as fruit of the poisonous tree" (citation and internal quotation marks omitted)).[44]

### d. Whether the Search Warrant was a General Warrant, i.e. was Unconstitutionally Overbroad

Jackson argues that the search warrant was overbroad and, as such, constituted an unlawful general warrant. *See* Suppression Mot. at 6. Jackson contends that the warrant was overbroad because it did not limit the search by dates despite only twice identifying Jackson's involvement in criminal activity in the affidavit of probable cause. *See id.* He also claims that the application did not particularly describe the place within the phones to be searched and things to be seized.

---

[44] Even if there was evidence produced during the meeting with Jackson that should be suppressed because of a constitutional violation, Jackson does not appear to have made any statement that was included in the affidavit of probable cause. Moreover, even there was such a statement referenced in the affidavit, the Magistrate Judge would still have had a substantial basis for finding probable cause if the Court were to excise any evidence unlawfully obtained during this meeting from the affidavit. *See United States v. Johnson*, 690 F.2d 60, 63 (3d Cir. 1982) (holding that, "even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit"); *see also United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) ("The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." (internal citation omitted)).

*See id.* Essentially, Jackson asserts that law enforcement was improperly able to search his three phones without limitation. *See id.* As explained below, Jackson's claims are meritless.

Concerning allegations that a search warrant was unconstitutionally overbroad:

> The Fourth Amendment prohibits "[g]eneral warrants" that would allow "exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 479, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). To guard against such general warrants, courts require "particularity," which "prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231 (1927). Particularity has three components: "First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (citations omitted).

*United States v. Perez*, 712 F. App'x 136, 138–39 (3d Cir. 2017) (alterations in original).

Here, the warrant was not overbroad. Contrary to Jackson's argument, the lack of a limitation in the search warrant for the locations in the cell phones to be searched or the date range within which law enforcement could search for evidence does not render this search warrant unconstitutionally overbroad.[45] Instead, the warrant satisfies all the requirements for sufficient particularity for the following reasons. First, it identifies the particular offenses for which the FBI established probable cause. *See id.* at 139. The warrant stated that, *inter alia*, law enforcement was looking for evidence of, among other offenses, narcotics trafficking, using communication facilities to facilitate narcotics trafficking, conspiring to distribute narcotics, and firearms offenses. *See* Gov't's Ex. 20; *see also id.*, Attachment B (listing offenses for which law enforcement was searching for evidence). Second, the search warrant described the place to be searched. *See Perez*, 712 F. App'x at 139. It stated that Jackson was in possession of three cell phones at the time of his

---

[45] Jackson does not cite to any case holding that a similar search warrant violated the Fourth Amendment, and this Court has not located such a case.

arrest, and SA Hallowell was seeking a search warrant to search the data inside those cell phones. *See* Gov't's Ex. 20. Finally, the warrant identified the items sought to be seized and their relationship to the alleged crimes. *See Perez*, 712 F. App'x at 139. SA Hallowell, *inter alia*, specifically identified the three cell phones to be searched, explained how those cell phones related to the designated crimes, described in detail his knowledge based on his training and experience about how individuals involved in illegal drug trafficking used cell phones to facilitate those crimes, and discussed the ways in which drug traffickers used their cell phones generally. *See* Gov't's Ex. 20 at ¶¶ 4, 9, 12, 19–28, 30–37, & Attachment A. He also explained in detail what law enforcement was seeking to search for and seize on the cell phones. *See id.*, Attachment B.[46]

> In addition, and perhaps most importantly, SA Hallowell, limited the search for
>
> evidence of violations of Title 21, United States Code, Sections 841, narcotics trafficking, Title 21, United States Code, Section 843, use of communication facilities to facilitate narcotics trafficking, Title 21, United States Code, Sections 846, conspiracy to distribute narcotics, Title 18, United States Code, Sections 922(g) felon in possession of a firearm, and Title 18, United States Code, Sections 924(c) possession of a firearm in furtherance of narcotics trafficking.

*Id.* Therefore, law enforcement was limited to searching for, and ultimately seizing, evidence which related to only those offenses. At bottom, the search warrant was not lacking in particularity and, as such, was not unconstitutionally overbroad. *See, e.g.*, *United States v. Bellucci*, No. 23-CR-083, 2023 WL 8528433, at *6–8 (M.D. Pa. Dec. 8, 2023) (rejecting defendant's claim that search warrant was overbroad).

---

[46] Particularly Attachment B to the application. *See United States v. Hines*, Crim. A. No. 20-421-1, 2022 WL 2159267, at *4 (E.D. Pa. June 14, 2022) ("The particularity requirement—'the touchstone of [the] warrant,' *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004)—is expressly satisfied by listing items to be seized or expressly incorporating an affidavit that lists such items." (citing *Bartholomew v. Commonwealth of Pa.*, 221 F.3d 425, 428–29 (3d Cir. 2000))).

**e.**       **Whether the Search Warrant was Supported by Probable Cause**

Jackson argues that the search warrant was not supported by probable cause because

> [t]he only alleged use [of the three cell phones] by [him] in this case was a FaceTime conversation allegedly overheard by agents who were not anywhere near the phone call and the records from a co-defendant's phone log showing the number 215-552-1092 assigned to a contact 'Bro Reef.' Co-defendant [Diane] Gillard's records also allegedly show six (6) calls made from her phone on July 7, 2022 to this number. The probable cause [affidavit] does not list any other phone numbers associated with [him] as it pertains to any other transaction in the [superseding] indictment.

Suppression Mot. at 6. The Court disagrees.

There is ample evidence identified in SA Hallowell's affidavit establishing that "there is a fair probability that contraband or evidence of a crime will be found" in the three cell phones described in the warrant. *Gates*, 462 U.S. at 238. The affidavit describes the observations of Jackson's involvement in drug trafficking and the connection between him and the three cell phones. Accordingly, the Magistrate Judge had a substantial basis for finding probable cause based on the information SA Hallowell supplied as part of the search warrant application.

Even if the Court found that the Magistrate Judge lacked a substantial basis for finding probable cause, exclusion of the seized evidence would not be appropriate because law enforcement acted in good faith or in objective reasonable reliance on the search warrant. In this regard, the Court points out that to "effectuate the Fourth Amendment right of all citizens to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" the Supreme Court adopted the exclusionary rule, which provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citations and internal quotation marks omitted). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.* (citations omitted).

Courts apply the exclusionary rule

"only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule" to ward against unreasonable searches and seizures by law enforcement. *United States v. Leon*, 468 U.S. 897, 918 (1984). Courts must perform a "rigorous" test to measure the "deterrence benefits of exclusion" against "substantial social costs." *Davis v. United States*, 564 U.S. 229, 237–38 (2011).

The good faith exception buttresses this test. The good faith exception prevents suppression of evidence when the executing officers acted in "good faith" or "objectively reasonable reliance" on a "subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. Thus, in instances where an officer acted illegally but "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment.... [the exclusionary rule] should not be applied[ ] to deter objectively reasonable law enforcement activity." *Id.* at 918-19. Further, the exclusionary rule is only implemented when law enforcement conduct is "deliberate, reckless, or grossly negligent." *Herring v. United States*, 555 U.S. 135, 144 (2009).

Accordingly, the test to determine if the good faith exception applies is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999). "[A]ny defects in the warrant" and "the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known" are both evaluated by courts. *United States v. Franz*, 772 F.3d 134, 147 (3d Cir. 2014). Courts must recognize that law enforcement officers do not have an expert grip on the law and are not "expected to question the magistrate's probable-cause determination." *Leon*, 468 U.S. at 921. *See also Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986) ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." (internal quotation marks and citation omitted)).

There are four instances, however, where the good faith exception does not apply:

(1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

(3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).

*United States v. Henry*, No. 21-3254, 2023 WL 2770817, at *2–3 (3d Cir. Apr. 4, 2023) (internal footnote omitted) (alterations in original), *cert. denied*, 144 S. Ct. 208 (2023).

In this case, none of the exclusions to the good faith exception apply. As already explained, SA Hallowell's affidavit of probable cause was not "deliberately or recklessly false," "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or "so facially deficient that it failed to particularize the place to be searched or the things to be seized." *Id.* at *3 (quoting *Tracey*, 597 F.3d at 151). In addition, there is no evidence in the record, or argument from Jackson, that the Magistrate Judge "abandoned his . . . judicial role and failed to perform his . . . neutral and detached function." *Id.* (quoting *Tracey*, 597 F.3d at 151). Therefore, the good faith exception would apply even if the Court would have found that there was not a substantial basis for finding probable cause. Accordingly, Jackson's Motion to Suppress is properly denied.

## III.    CONCLUSION

Jackson has failed to show that he is entitled to relief on any of his pretrial motions. He has not shown that a bill of particulars of severance of his trial from his co-defendants is warranted. He has also not demonstrated that the Government's agents need an order directing them to retain their rough notes, a basis to allow him to join in any co-defendant's pretrial motions, or a reason to extend the time for him to file additional pretrial motions considering he had an opportunity to file such a motion and did not include claims that he expressed an intent to make. Moreover, he has not asserted a plausible ground for precluding the Government from introducing certain Rule

404(b) evidence during the upcoming trial, especially considering the Government is representing it does not intend to introduce such evidence in its case-in-chief. Finally, Jackson has not satisfied his burden to show that any evidence obtained from the search of his three cell phones pursuant to a valid search warrant should be suppressed. To the contrary, the evidence shows that the search warrant was sufficiently particular (and thus not overbroad), as well as demonstrates that a substantial basis existed for the Magistrate Judge to find probable cause. Accordingly, Jackson's pretrial motions will be denied.

An appropriate Order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge